IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


CHARLES SYSKO                          :
                    Plaintiff          :
                                       :
        v.                             :        3:CV-07-0470
                                       :        (JUDGE VANASKIE)
PPL CORPORATION, and PPL               :
SUSQUEHANNA, LLC, t/d/b/a PPL          :
                    Defendants         :


MEMORANDUM

In September of 2005, Charles Sysko's status of unescorted access at the

Susquehanna Steam Electric Station, a nuclear power facility, was revoked and he was

reassigned to a position that did not require unescorted access.  Plaintiff's new position on the

loading docks was compensated at the same salary as he received for the Instrument and

Controls Technician job he held at the time of the reassignment.  Plaintiff was returned to his

former position and his unescorted access status was reinstated in early 2006, about six

months after the reassignment.  Mr. Sysko brought this action against Defendants PPL

Corporation and PPL Susquehanna ("PPL"), asserting that the reassignment violated his rights

under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act

("PHRA").  Defendants have moved for summary judgment.  (Dkt. 64.)[1]  Because there was

_____

[1] For the convenience of the reader of this Memorandum opinion in electronic format,
hyperlinks to the Court's record and to authority cited herein have been inserted.  The Court
accepts no responsibility for, and does not endorse, any product, organization, or content at

ample justification to revoke Sysko's unescorted access status, which rendered Mr. Sysko unqualified to work as an Instrument and Control Technician, Defendants' summary judgment motion will be granted.

## I. BACKGROUND

"Plaintiff is currently employed as an Instrument and Controls ("I&C") Tech Level II in the Maintenance Department of the Nuclear Power Station known as the Susquehanna Steam Electric Station ("SSES")." (Defendants' Statement of Undisputed Material Fact, ("DSUMF"), Dkt. 66, at ¶ 8.)  SSES is maintained by Defendants.

"As a company that operates a nuclear power station, PPL is required to abide by the applicable federal regulations implemented by the Nuclear Regulatory Commission ("NRC") regarding nuclear facilities, including the requirement that it have a Fitness for Duty Procedure through which it determines which individuals are suitable to have unescorted security access to the facility." (Id. at ¶ 1.)  "NRC regulations state that a company's unescorted access authorization program must include '[b]ehavioral observation, conducted by supervisors and management personnel, designed to detect individual behavioral changes . . . .'" (Id. at ¶ 2 (quoting 10 C.F.R. 73.56(b)(2)(iii); see also 53 Fed. Reg. 7534 ("Each individual granted unescorted access shall be subject to a CBOP [continual behavioral observation program] . . .

---

any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

that provides for management/supervisory personnel responsibility for observing personnel for behavioral traits and patterns that may reflect adversely on their trustworthiness or reliability and reporting those observations to appropriate utility management")).

PPL's Fitness for Duty/Behavior Observation Program ("BOP") "requires that all company supervisors be vigilant in identifying any changes in employees' behavior and complete a Behavioral Observation Referral form ("BOR") upon detecting a change in behavior." (DSUMF, Dkt. 66, at ¶ 3.) "PPL provides its supervisors with Behavior Observation Questions – a list of examples of behaviors that should be reported." (Id. at ¶ 6.) In addition to the BOR, supervisors also complete an Annual Supervisory Review ("ASR"), which serves as an evaluation of each employee over the past year. (Id. at ¶ 5.)

On Saturday, September 17, 2005, at 11:04 a.m., Robert Southerworth, a PPL employee, sent Plaintiff's supervisor, Joseph Redinski, Jr., an e-mail entitled "Annual Supervisor Review (ASR) Sysko." (Southerworth E-Mail, Dkt. 72-2, at 25.) The e-mail stated: "You have been assigned as FFD/BOP Supervisor for Charles Sysko. Please complete the ASR in your inbox for Sysko. Please call if you have any questions." (Id.)

Redinski submitted the ASR on September 22, 2005. In this form, Redinski noted several changes in Plaintiff's work, social interaction, and personal behavior. (Id. at ¶ 9.) Redinski did not consult with anyone or receive any assistance in completing the ASR, but did discuss its contents with Violet DeAngelo from Human Resources after he completed it but

3

before he submitted it.  (Redinski Dep., Dkt. 72-2, at 11.)[2]  Redinski did not discuss any of his

concerns with Plaintiff.

The ASR indicated that there had been changes in the quality and quantity of Plaintiff's

work; numerous absences from work; failure to adhere to company policies; changes in

Plaintiff's sociability, speech, and behavior; fatigue; and nervousness.  (ASR, Dkt. 68-7, at 2-3.)

In describing these changes, Redinski noted:

1. CHANGES IN WORK BEHAVIOR
a. Quantity of work lower.  Package walk downs late.  I provided report card to all
crew members to help meet requirements and show progress but he is still late.
Shows little interest in work.
e. Excessive time off, over 250 hours for the year claimed by a bad hip, all the
same occurrence.  He can't sleep at night, sometimes only an hour or so.
Arrives late for work on numerous occasions due to sore hip in the morning or
just plain tired from lack of sleep.  Can't get thru gatehouse due to metal hip
replacement.  We requested he look into FMLA.  Also requested he leave from
home earlier to be on time, but he claims its security's job to get him in the
gatehouse on time.  Over the course of the year, missed various training courses
due to sickness.
f. Property damage occurred in May to computer and he admitted to it after
investigation
g. Rebellious toward leader's directions.  He requested union business rep in.

2. Changes in social interaction behavior.
a. and b. Poor eye contact.  When speaking to management.  Holds grudges
against union members and management members.  Seems isolated from crew.
Numerous occasions the crew has requested [if] they can perform the work
without him.  My observation is that crew members are reluctant to sit near or
socialize with him.  I can not get facts from the techs why this is.

---

[2] Citations to page numbers refer to the page number of the document on the CM/ECF
electronic record.

c. Overreacts to imagined criticism.

e. I have observed a change in speech over the past 6 months.  He raises his voice and has a facial twist while bobbing his head.  His voice is load (sic) and slows when asked a question, looking away and sometimes talking out of the side of his mouth.

f Chuck is complaining more about a bad hip.  The pain at times at night is severe to keep him up and only produce 1 or 2 hours sleep.  Sometimes he needs massaging to ease the pain and it's hard for him to come in to work on time.  He has informed me he has refused the doctor's advice for a pain killer to sleep better.

3. CHANGES IN PERSONAL HEALTH BEHAVIOR.

A.  seems nervous and has constant leg bouncing when at tailboard meetings.  Awful fidgety when asked questions directly.

e.  Disinterested in work, seems he is not getting enough sleep due to hip problem.  Chuck seems preoccupied with other matters, constantly on computer e-mailing people.  On occasion, his eyes look tired.  He says he has trouble sleeping, tossing and turning all night.

4. OTHER BEHAVIOR CONCERNS.

Chuck sometimes wanders around the shop going from computer to computer and writing e-mails.  I have put out several times to the crew to use the computers for company use only[.] I have been told by others that he pounds on the keyboards so hard when frustrated that other techs won't use it because it's probably broken.

(ASR, Dkt. 68-7, at 4.) As a result of Plaintiff's ASR, a Behavioral Observation Referral form was completed that included Redinski's concerns.  (BOR, Dkt. 68-8, at 2-3.)

After reviewing Plaintiff's ASR and BOR, Robert Southerworth issued a memorandum to Plaintiff's file on September 22, 2005, which stated: "Site Access Services has reviewed the attached ASR documentation and accompanying Behavior Observation Referral provided by the FFD/BOP Supervisor Joseph Redinski and determined that Sysko should be

5

psychologically evaluated to determine his trustworthiness and reliability to maintain unescorted access." (Sept. 22 Memo, Dkt. 72-2, at 26.) It is PPL's practice that after a BOR is completed, Site Access Services automatically suspends that employee's unescorted access status pending a review by a psychologist.[3] (Lines Aff., Dkt. 76-3, at 2.)

After the BOR was submitted, but before the psychological review was completed, it was discovered that Plaintiff had made a comment to co-worker Michelle Bachert about his belief that it would be easy to bring a gun into the facility. (Sysko Dep., Dkt. 68, at 11; Statements, Dkt. 68-9, at 2-7.) Plaintiff testified that the comment stemmed from the frisking that occurred when he went through security. He stated that he had fourteen pounds of metal on his artificial hip, that security does not check the inside of his leg, and thus, anybody could get a gun into the facility if they wanted to. (Sysko Dep., Dkt. 68, at 11.) Plaintiff explained that the comment was made out of frustration because his search that day took so long. (Id.) Plaintiff agreed that this type of comment would raise a safety concern. (Id.)

Between September 26, 2005, and September 28, 2005, three co-workers made

---

[3] John Lines, the then-Supervisor of Site Access at SSES, stated that he "put Mr. Sysko's access on admin. hold [and] assigned Mr. Sysko to talk with [a third-party] psychologist." (Lines Dep., Dkt. 68-2, at 5.) John Lines also testified that before this incident he had met with Violet D'Angelo and Jim Lauro regarding Plaintiff and difficulties that were arising with Plaintiff's use of sick time and late arrival. (Id. at 5.) Lines indicated to D'Angelo and Lauro that Plaintiff's absence from work for three or four days straight did not qualify for the use of "for-cause testing." (Id.) During the course of this meeting the parties mentioned other items concerning Plaintiff's behavior that led Lines to believe that a Behavior Observation Referral, as opposed to a "for-cause testing," was appropriate. (Id.)

statements that essentially revealed they were concerned for their safety because of Plaintiff. (Statements, Dkt. 68-9, at 2-7; Sysko Dep., Dkt. 68, at 12.) These statements were given to John Paciotti, PPL's Security Operations Supervisor at SSES, who forwarded them "down to the access side which is the people who would be dealing with the clearance . . . ." (Paciotti Dep., Dkt. 68-5, at 3.)

On September 26, 2005, Plaintiff was examined by Dr. John Baird, a psychologist retained by PPL to evaluate individuals concerning unescorted access in SSES. (DSUMF, Dkt. 66, at ¶ 22.) "To assist Dr. Baird in his evaluation, [Dr. Baird] requested that [Plaintiff] also be evaluated by Dr. Albert Alley, PPL's Medical Review Officer." (Id. at ¶ 23.) "Dr. Albert Alley evaluated [Plaintiff] and submitted a report . . . dated September 26, 2005." (Id. at ¶ 24.) Dr. Alley's report indicated that there was a "moderately high probability that medical problem [sic] affect his current psychological state." (Alley, Dkt. 68-11, at 3.)

After interviewing Plaintiff, "Dr. Baird opined that [Plaintiff] was not 'violent or dangerous' but stated that 'these careless comments must be considered as evidence of degenerative behaviors in the face of personal distress.'" (DSUMF, Dkt. 66, at ¶ 29.) Dr. Baird concluded: "It is my professional opinion that [Plaintiff] is a potential security risk at this time. It is my recommendation that [Plaintiff] be denied unescorted access to the protected area." (Psych. Inter. Summ., Dkt. 68-13, at 4.) Dr. Baird determined that Plaintiff's "unescorted access (UA) to the SSES should remain withdrawn for a period of time due to unreliability. [Plaintiff] needs

complete and independent medical/psychological workups to include blood work (diabetes?), hip replacement decision, pain management, stress medication?, and sleep apnea/deprivation assessment." (Id. at 3.) It was also Dr. Baird's opinion that Plaintiff should be re-evaluated for unescorted access after a period of at least three months. (Id.) Based upon Dr. Baird's report, John Lines revoked Plaintiff's unescorted access status.[4]

"On September 29, 2005, Plaintiff was informed that his unescorted access was revoked and that he could be re-evaluated after a period of at least three months." (DSUMF, Dkt. 66, at ¶ 33.) "After his unescorted access was revoked, PPL's Human Resources Department offered [Plaintiff] the choice of two temporary positions – one cleaning offsite facilities or another on the loading dock – until [Plaintiff] was able to regain his unescorted access." (Id. at ¶ 34.)

Plaintiff chose to work on the loading dock and began working in that capacity on or about September 30, 2005. (Id. at ¶ 36.) Plaintiff received the same hourly wage and benefits while working at the loading dock that he had been receiving.[5] (Id. at ¶ 35.)

After Plaintiff's unescorted access was suspended, he was evaluated by a number of health care professionals, including: Dr. Charles A. Gordon, an internal medical practitioner; Dr.

---

[4] Although acknowledging that the psychologist's recommendation was not binding, Lines testified that he always followed the psychologist's recommendation that unescorted access status be revoked. Plaintiff has offered no evidence to refute Lines's assertion.

[5] Plaintiff claims that he received much less overtime in the loading dock position than he could have earned in the I&C Tech Level II position. He also contends that he received less compensation in the form of shift differentials and meal entitlements in the loading dock job. Plaintiff, however, did not provide any documentation substantiating his assertions.

Richard E. Fischbein, a forensic psychiatrist; and Dr. Michael Church, a licensed psychologist. (Id. at ¶¶ 37-39.) Each doctor evaluated Plaintiff and issued a report. (Id.) "Dr. Baird wrote a report to Lines, dated December 16, 2005, in which he stated that he reviewed the reports of Dr. Gordon and Dr. Fischbein and recommended 'a two pronged treatment plan . . . comprised of medical and psychological interventions.'" (Id. at ¶ 40.) Between January and February of 2006, Plaintiff received treatment from two psychiatrists, Dr. Moshin Qayyum and Dr. Susan Paolucci, and from a therapist, Eric Hill. (Id. at ¶ 41.)

On March 14, 2006, Plaintiff was evaluated by an independent contract psychologist, Dr. David Thompson, retained by PPL to evaluate individuals for unescorted access. (Id. at ¶ 42.) In Dr. Thompson's opinion, Plaintiff was no longer a security risk and he recommended that Plaintiff's unescorted access be reinstated. (Id. at ¶ 43.) On March 29, 2006, PPL reinstated Plaintiff's unescorted access and he returned to his I&C Tech Level II position.

On March 13, 2007, Plaintiff instituted this action. His Complaint asserts violations of the ADA, 42 U.S.C. § 12101, et seq., and the PHRA, 43 P.S. § 955(a). (Complaint, Dkt. 1.) Plaintiff avers that although he was not disabled, he was perceived as disabled by Defendants.

On November 3, 2008, following extensive discovery, Defendants filed a Motion for Summary Judgment, contending that Plaintiff was not regarded as disabled, was not a "qualified individual" as a matter of law, and did not suffer an adverse employment action because of a perceived disability. (Mt. S.J., Dkt. 64.) The matter has been fully briefed and is

ripe for review.

II.  DISCUSSION

   A. Standard of Review

   Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

   Initially, the moving party must show the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party satisfies its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of

summary judgment if there was adequate time for discovery and a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party" bears the burden of proof at trial.  Celotex, 477 U.S. at 322.

     B.  The Disability Discrimination Claim

"The ADA was enacted to bar employers from discriminating against qualified individuals

with a disability."  McCoy v. Pennsylvania Power & Light Comp., 933 F. Supp. 438 (M.D. Pa.

1996).

> To establish a prima facie case of discrimination under the ADA, a plaintiff must
> . . . show '(1) he is a disabled person within the meaning of the ADA; (2) he is
> otherwise qualified to perform the essential functions of the job, with or without
> reasonable accommodations by the employer; and (3) he has suffered an
> otherwise adverse employment decision as a result of discrimination.'

Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (quoting

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).  The analytical framework

of a disability discrimination action under the PHRA is essentially identical to that of a claim

under the ADA.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Kelly v.

Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Connors v. Chrysler Fin. Corp., 160 F.3d 971,

972 (3d Cir. 1998).  Accordingly, the analysis of Plaintiff's ADA claim is equally applicable to his

claim of disability discrimination under the PHRA.

A "disability" is defined as: "(A) a physical or mental impairment that substantially limits

one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C)

being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Accordingly, to fall within this definition, one must have an actual disability (subsection A), have a record of disability (subsection B), or be regarded as having one (subsection C)." Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999).

Plaintiff claims to fall within the purview of the ADA and PHRA as a person Defendants regarded as having a disability. "For an individual to be 'disabled' under the 'regarded as' portion of the ADA's definition of disability, the individual must demonstrate either that: (1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities." Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001). The analysis under the "regarded as disabled" standard focuses not on the plaintiff's actual abilities, "'but rather on the reactions and perceptions of the persons interacting or working with him.'" Robinson v. Lockheed Martin Corp., 212 F. App'x 121, 125 (3d Cir. 2007) (quoting Kelly, 94 F.3d at 109).

The ADA defines the term "qualified individual with a disability" as

an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). "The burden is on the employee to prove that he is 'an otherwise qualified' individual.'" Ozlek v. Potter, 259 F. App'x 417, 420 (3d Cir. 2007) (quoting Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996)). As explained in Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998):

> A two-part test is used to determine whether someone is 'a qualified individual with a disability.' First, a court must consider whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' Second, the court must consider 'whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation.' 'The determination of whether an individual with a disability is qualified is made at the time of the employment decision.'

In Mathieson v. American Electric Power, No. 1:00cv870, 2002 U.S. Dist. LEXIS 6560 (W.D. Mich. Jan. 14, 2002), the court held that "a legally dictated fitness-for-duty program is 'by its very nature an essential function [of the position] under section 12111(8)'" of the ADA. (quoting Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 850 (6th Cir. 1998)). The court held "the inability to meet the requirements of federal regulations concerning access to regulated nuclear power plants requires a finding that an ADA plaintiff is not a 'qualified individual.'" Id. at *11. The Michigan court explained that a determination that the inability to satisfy a fitness for duty program was not an essential function would force an employer to choose between ignoring the requirements of a federal regulation or violating the ADA. Id. at *10; accord Mitchell v. Crowell, 966 F. Supp. 1071, 1079 (N.D. Al. 1996) (holding that "[b]ecause plaintiff's position required a security clearance which she was unable to obtain, reasonable

13

accommodation is not available," and consequently, she was not qualified for the position).

In McCoy v. Pennsylvania Power & Light Comp., 933 F. Supp. 438, 443 (M.D. Pa. 1996), a case before the Honorable James F. McClure, Jr., of this Court, the essential issues to resolve in determining whether the plaintiff was qualified for the position, included: (1) whether a security clearance was a "qualification" for plaintiff's job; and (2) whether security clearance was an "essential function" of plaintiff's job. In McCoy, the plaintiff was a nuclear plant operator who had notified the defendant that he was an alcoholic, had been arrested for DUI, and was experiencing marital problems. As a result, the defendant suspended his security clearance. Judge McClure determined that "NRC regulations make security clearance an essential component to plaintiff's former job as a nuclear plant operator," and "maintaining security clearance is an essential job function and any revocation or suspension of that status renders an employee ineligible, i.e. not qualified, under NRC regulations, to work as a nuclear plant operator." Id. at 443. The court further found that "failure to suspend or revoke his security status would have placed PP&L in conflict with, and in derogation of, its duties as an [sic] nuclear plant licensee to safeguard the public welfare by restricting unsupervised access to secure areas to those not likely to pose a risk to operation of the plant." Id. at 444. Finding that revocation of the plaintiff's security access was both justified and necessary, the court concluded:

> PP&L could make no 'reasonable accommodation' that would have allowed plaintiff to remain in his former position and retain his security clearance without

14

compromising its obligation imposed by NRC regulations to supervise carefully employees granted access to secure areas and take steps to restrict access by any employee who poses a potential threat to the safe operation of the plant.

Id.[6]

In McDaniel v. AlliedSignal, Inc., 896 F. Supp. 1482 (W.D. Mo. 1995), the plaintiff was an electrician at AlliedSignal, a management and operating contractor for a United States Department of Energy plant that produced non-nuclear components for nuclear weapons. Id. at 1483. McDaniel was arrested and pled guilty to driving while intoxicated and his security clearance was suspended. The court determined that the plaintiff was "not a 'qualified individual' with a disability within the meaning of the statute" because he could not maintain his security clearance. Id. at 1491. Because he was not a "qualified individual" under the ADA, the defendant could not "accommodate the essential function of maintaining a government security clearance." Id.

The foregoing authorities provide ample precedent for the conclusion that Mr. Sysko was not "otherwise qualified to perform the essential functions of the job," and consequently can not be characterized as a qualified individual under the ADA and PHRA. In order to qualify

---

[6] Although the court found that the employer could not make a reasonable accommodation in order for the plaintiff to maintain his position as a nuclear plant operator, the court in dicta indicated that "PP&L's reassignment of [the plaintiff] to a loading dock position which does not require security clearance is a reasonable accommodation within the meaning of the ADA such that no liability attaches to its decision to revoke his security status." Id. at 444.

as an I&C Tech II, Defendants require that Plaintiff maintain unescorted access status in the nuclear facility. (Sysko Dep., Dkt. 68, at 3.) Plaintiff's failure to maintain unescorted access status at SSES rendered it impossible for him to perform any function of his job, much less the essential functions.

Plaintiff argues that <u>McCoy</u> is distinguishable in that Mr. McCoy admitted his alcoholism. That fact, however, does not affect the essential point of Judge McClure's well-reasoned holding: an employee who is unable to maintain unescorted access status is not qualified to perform the essential functions of a position within the SSES nuclear facility. Indeed, as in this case, PPL relied upon Dr. Baird's recommendation in <u>McCoy</u>.

Plaintiff does not challenge Dr. Baird's determination, but instead argues that notice of Plaintiff's comment regarding the ability to bring a gun into the facility was not received until after Plaintiff's administrative suspension. Plaintiff contends that the timing of the reports raises credibility issues sufficient to defeat the summary judgment motion. (Brief in Opp., Dkt. 69, at 10.)

This argument is without merit. Even though Michele Bachert, Richard Capele, and Timothy Swank's statements were produced after the BOR was completed, they were properly taken into account before Plaintiff's unescorted access was revoked.[7] The pertinent statements

---

[7] Michele Bachert's statement, dated September 26, 2005, was that:

About 3 weeks ago (possible 4) during dayshift, Chuck Sysko said to me that he

16

were given to Defendant between September 26, 2005, and September 28, 2005. (Dkt. 68-9,

------------------------

> could get a gun through the gatehouse anyday he wanted to. He has a replacement hip that sets off the metal detector. He noted the way they hand frisk him, he could tape a gun to the inside of his leg and it would go un-noticed. I did not think much of this until a fellow co-worker (Bill Kenny) noted Chuck's mood swings & wasn't sure what was going on with him. Chuck is very vindictive & I hesitate telling anyone this, but there has been some concern.

(Dkt. 68-9, at 2.)

> On September 27, 2005, Richard A. Capele wrote:

> About two or three months ago while working in the reactor building 683 Chuck Sysko was sent out to assist in the job. While working I observed Chuck to be very agitated. I observed him slaming [sic] a calibrated heise pressure gauge. I was also informed by John Speicher on Friday 9-23-05 that Chuck Sysko was involved in an incident involving a pre staged cart of tools and test equipment in the I&C 676 Shop Severial [sic] weeks ago. I was also informed by Steve Hamelton that Steve overheard Sysko theraten [sic] Keven Horsfall over an incident that occurred over damage done to a computer monitor in the I&C shop.

(Dkt. 68-9, at 4-5.)

> Timothy Swank wrote

> I have concerns for my personal safety as well as plant safety, with regards to Chas Sysko. Due to disagreement on multiple Union issues, Mr. Sysko has shown a vindictive behavior towards me. He has also shown many facial ticks or twinges that I am concerned may show unstability [sic]. The latest incident is that he told a co-worker, Michele Bachert, that he can get a gun into work. I am very worried about my personal safety if he gets a gun into work or even brings it to the parking lot outside. I'm concerned that if I'm forced to work with him that he may intentionally set me up for failure, thus jeopardizing the plant.

(Dkt. 68-9, at 6-7.)

at 2-7.) Plaintiff was informed that his unescorted access was revoked on September 29, 2005, based upon Dr. Baird's recommendation. (DSUMF, Dkt. 66, at ¶ 33.) There is no support for the proposition that Defendants could not use comments made by Plaintiff, which Plaintiff has admitted making, in determining that Plaintiff posed a potential security risk because they first came to light after his security clearance was administratively suspended. To hold otherwise would impose an unreasonable constraint on those charged with safety and security at nuclear power facilities.

Plaintiff argues that the administrative suspension of his security clearance was flawed because proper protocol was not followed. This argument is meritless for at least three reasons. First, there is no dispute that administrative suspension of security clearance is automatic whenever a Behavioral Observation Report form is submitted, regardless of whether company-prescribed procedures were followed. Second, it is also indisputable that security clearance was revoked only after a psychological evaluation that was unaffected by any procedural irregularities accompanying the submission of the BOR. And finally, a careful review of the record discloses that company policy was followed in all material respects.

The NRC regulations provide:

Fitness-for-duty programs must: (a) Provide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties.

10 C.F.R. § 26.23(a). The regulations further provide that all licensees authorized to operate a

nuclear power reactor must "[p]rovide reasonable measures for the early detection of persons who are not fit to perform the duties that require them to be subject to the FFD program." 26 C.F.R. § 26.23(c). "If an individual appears to be impaired or the individual's fitness is questionable . . . the licensee or other entity shall take immediate action to prevent the individual from performing the duties that require him or her to be subject to this subpart." 10 C.F.R. § 26.77(b).

Defendants' BOP provides that supervisors shall be responsible for "[o]bserving personnel for behavioral traits and patterns that may reflect adversely on the trustworthiness and/or reliability" of the employee, "remaining aware of behaviors that might be adverse to safe operation of the station," and "reporting observations of behaviors, behavioral traits, and patterns of behavior that may reflect adversely upon a person's trustworthiness and/or reliability or may be adverse to safe plant operations to a Responsibility Center Head or manager and to Site Access Services." (Dkt. 68-6, at 10.) The BOP applies to "[a]ll individuals granted unescorted access or in the process of obtaining unescorted access to protected areas of the SSES." (Id. at 7-8.)

The BOP further provides that "[s]upervisors shall identify and document off-normal behavior as follows: (a.) Record facts as they occur and keep accurate records. These records can become a tool for taking appropriate action. (b.) Document changes in terms of observable behaviors. (c.) Be specific in their determination." (Id. at 27.) Upon noticing changes in

19

behavior, supervisors should talk with the individual, report the results of the conversation immediately to a manager, take action to remove access from the secured area if the behavior impacts trustworthiness and reliability, and complete a Behavior Observation Referral form and submit it to the Site Access Services Supervisor. (Id.)

The BOP "is the primary means for determining continued trustworthiness and reliability of covered individuals." (Id. at 72.) As such, the BOP review is to be based on interactions with the individual during the course of the review period and should include:

> (1) A description of any condition that may have resulted in the employee acting or behaving in an unconventional manner.
> (2) Any circumstances which may indicate the need to refer the employee for additional medical or psychological review.
> (3) Any information developed over the review period, regarding the behavioral characteristics of the employee supervised. This information would typically include behavioral norm deviations which have been reported to the supervisor through implementation of the BOP, as well as those behavioral norm deviations personally observed by the supervisor.

(Id. at 74.)

Plaintiff's supervisor and co-workers noticed changes in Plaintiff's behavior. Pursuant to the requirements of the BOP – the Defendants' NRC required fitness for duty program – Plaintiff was examined by Dr. Baird and Dr. Alley. Based on these examinations, it was determined that Plaintiff's unescorted access should be revoked.

Plaintiff's Brief in Opposition to the Motion for Summary Judgment fails to argue that the changes in behavior did not occur. Instead, Plaintiff contends that the ASR and BOR were

fatally flawed due to Redinski's failure to make contemporaneous entries of behavioral changes, counsel Plaintiff about the changes in behavior, or list the behavioral changes on the annual Bargaining Unit Performance Review completed by Redinski three months earlier.[8] (Brief in Opp., Dkt. 69, at 12.)  There is no support for the assertion that employee counseling was required whenever behavioral changes were first observed.  Deposition testimony clearly reveals that Redinski was under no duty  to "counsel" Plaintiff about his behavioral changes. (Lines Dep., Dkt. 68-2, at 6.)  Although counseling was suggested, it was not a prerequisite to a BOP or revocation of unescorted access.  Furthermore, it was not Redinski's job to diagnose the cause of Plaintiff's change in behavior or to determine his qualification for unescorted access.  Redinski's responsibility was limited to "[r]eporting observations of behaviors, behavior traits, and patterns of behavior that may reflect adversely upon a person's trustworthiness and/or reliability or may be adverse to safe plant operation to a Responsibility Center Head or manager and to Site Access Services."  (BOP, Dkt. 68-6, at 10.)  This is exactly what he did.

As a result of Redinski's ASR, Gregory F. Ruppert completed a BOR that was sent to

---

[8] On June 26, 2005, Redinski completed a Bargaining Unit Performance Review which found that Plaintiff's overall performance was "Satisfactory" in an "Outstanding-Very Good-Satisfactory-Marginal-Unsatisfactory" scale.  (Review, Dkt. 72-2, at 33.)  The Bargaining Unit Performance Review addressed  Plaintiff's performance in ten categories: 1) safety; 2) job knowledge; 3) productivity and quality of work; 4) dependability; 5) interpersonal skills; 6) leadership; 7) Technical Training Program; 8) specific performance objectives; 9) development plan; and 10) overall performance duties.  (Id. at 33-36.)  Plaintiff was not presented with his review until August 1, 2005.  (Id. at 36.)

Site Access Services Supervisor John Lines. (BOR, Dkt. 68-8, at 2.) Upon receipt of the BOR, Plaintiff's unescorted access status was automatically suspended pending the results of Plaintiff's psychological examinations. (DSUMF, Dkt. 66, at ¶ 15.) It was company policy for employees to be examined by a third party doctor once a BOR was filed, and company policy was followed in this case when Plaintiff was examined by both Dr. Baird and Dr. Alley. (Lines Aff., Dkt. 76-3, at 3.) Dr. Baird determined that Plaintiff was a "potential security risk" (Psych. Inter. Sum., Dkt. 68-13, at 4), and based on this determination, Lines revoked Plaintiff's unescorted access status. Although Lines may not have been required to adopt Dr. Baird's recommendation, no liability can attach for his decision to do so.

The NRC's Fitness-for-Duty provisions clearly provide that "[i]mpaired workers, or those whose fitness may be questionable, shall be removed from activities within the scope of this Part, and may be returned only after determined to be fit to safely and competently perform activities within the scope of this Part." 10 C.F.R. § 26.27(b)(1)(2006). Here, Plaintiff's supervisor, although arguably not reporting his concerns with the detail and precision prescribed by the BOP, properly identified his concerns on the ASR that was used to complete the BOR. Those concerns called into question Plaintiff's fitness for unescorted access status. Although Redinski failed to include dates or locations in his review, many of the issues listed in the review were behavioral changes that had occurred over a period of time. Furthermore, with regard to particular occurrences, Redinski included details. (Plaintiff was late in turning in

22

report card, had taken over 250 hours off, caused property damage in May, and exhibited nervous leg bouncing at tailboard meetings (ASR, Dkt. 68-7, at 4).) Redinski also noted that there were changes in Plaintiff's work behavior, social interaction, and personal health. (Id.) Specifically, the review noted that Plaintiff was showing little interest in work, had taken excessive time off, had admitted to causing property damage, was rebellious towards leadership, had poor eye contact with management, overreacted to imagined criticism, talked out of the side of his mouth, and appeared preoccupied with non-work matters. (Id.)

In summary, Defendants had ample justification to assess Plaintiff's unescorted access status under the BOP. Plaintiff's status was revoked for six months based upon recommendations of qualified health care professionals. Revocation of his unescorted access status rendered Plaintiff "unqualified" for his position as an Instrument and Control Technician. As a matter of law, Plaintiff cannot sustain his burden of showing that he was a qualified individual under the ADA or PHRA. See McCoy, 933 F. Supp. 438; Mathieson, 2002 U.S. Dist. LEXIS 6560; Mitchell, 966 F. Supp. 1071; McDaniel, 896 F. Supp. 1482. Thus, even if Plaintiff could establish that Defendant regarded him as disabled due to perceived mental health issues, he cannot show that he was qualified to perform the essential functions of the I&C Tech position because Defendants properly revoked his security clearance based upon the

recommendation of a psychologist following an appropriate evaluation.[9]  Accordingly,

Defendants' Motion for Summary Judgment will be granted.

III.  CONCLUSION

      For the reasons stated, Defendants' Motion for Summary Judgment will be granted.  An

appropriate Order follows.

                         s/ Thomas I. Vanaskie
                         Thomas I. Vanaskie
                         United States District Judge

---

[9] The fact that security clearance was reinstated on the basis of another psychological evaluation strongly suggests that Defendants did not regard Plaintiff as disabled or discriminate against him on the basis of a perceived disability.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


CHARLES SYSKO                          :
                    Plaintiff          :
                                       :
        v.                             :          3:CV-07-0470
                                       :          (JUDGE VANASKIE)
PPL CORPORATION, and PPL               :
SUSQUEHANNA, LLC, t/d/b/a PPL          :
                    Defendants         :

                              ORDER

        NOW, THIS 2nd DAY OF DECEMBER, 2009, for reasons set forth in the foregoing

memorandum, IT IS HEREBY ORDERED THAT:

        1.  Defendants' Motion for Summary Judgment (Dkt. 64) is GRANTED.

        2.  The Clerk of Court is directed to enter judgment in favor of Defendants and to mark

this matter CLOSED.



                                        s/ Thomas I. Vanaskie
                                        Thomas I. Vanaskie
                                        United States District Judge